J-S01040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN ARMSTRONG, | : | |
| | : | |
| Appellant | : | No. 235 EDA 2019 |

Appeal from the Judgment of Sentence Entered September 23, 2016
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011105-2014

BEFORE:   BOWES, J., KUNSELMAN, J. and STRASSBURGER, J.[*]

MEMORANDUM BY STRASSBURGER, J.:          **FILED APRIL 03, 2020**

Brian Armstrong (Appellant) appeals *nunc pro tunc* from the judgment of sentence imposed following his convictions for third-degree murder and endangering the welfare of a child (EWOC).  Upon review, we affirm.

We provide the following background.  Appellant resided at his parents' home with his wife, sister, cousin, his one-year-old baby, K.A., and his two-month-old infant, H.A.  N.T., 6/20/2016, at 123, 125.  On August 1, 2014, at approximately 12:00 p.m., Appellant's wife departed the residence for work, leaving K.A. and H.A. in Appellant's exclusive custody and care.

_____

[*] Retired Senior Judge assigned to the Superior Court.

N.T., 6/17/2016, at 137. It was Appellant's "first time actually being alone with [his] children" as the sole caretaker.[1] N.T., 6/20/2016, at 129.

When Appellant's wife departed, H.A. appeared to be unharmed. N.T., 6/17/2020, at 138. A few hours later, Appellant presented H.A. at Einstein Emergency Department in Philadelphia County. N.T., 6/20/2016, at 156. Upon arrival, H.A. was noted to be limp, had poor respiratory effort, and was completely unresponsive with fixed and dilated pupils, which indicated that he had significant brain injury. N.T., 6/17/2016, at 42. H.A. was without a heart rate and required "resuscitation, including intubation, CPR, [and] eventual placement of a chest tube." *Id.* In desperate need of more care, H.A. was transferred to Saint Christopher's Hospital for Children (Saint Christopher's) in Philadelphia. *Id.* at 43. Within a short period of his arrival, H.A. was declared brain-dead and placed on life support. *Id.* at 42-43. H.A. was diagnosed with a multitude of injuries: a severe, complex skull fracture on both sides of his skull; bleeding under the skull and outside of the brain; severe swelling of his brain; hemorrhages to the retina of his eyes; healing and new rib fractures, with bleeding surrounding both; a pulmonary hemorrhage; and injury to his liver. *Id.* at 44-46. Two days after his arrival at Saint Christopher's, H.A. was pronounced dead.

_____

[1] Although Appellant's sister was at the home, she was sleeping, and therefore, was not providing any care.

The nature of H.A.'s injuries triggered police involvement. While at Einstein Emergency Department on the day of the incident, Appellant provided Officer Roscoe Jones with his account of the events that led to H.A.'s injuries. N.T., 6/16/2016, at 59. In the meantime, Officer Alfonso Powers secured Appellant's home. *Id.* at 112. Rather than go with H.A. when he was transferred to Saint Christopher's, Appellant went home. N.T., 6/20/2016, at 161. When Appellant arrived home, Officer Powers transported Appellant and his sister to the Philadelphia Police Department homicide unit, and arrived at approximately 7:05 p.m. on August 1, 2014. N.T., 6/14/2016, at 56.

At the homicide unit, detectives conducted a series of interviews with Appellant regarding the events that led to H.A.'s injuries. Of particular interest to this appeal was a statement (video statement) taken on August 2, 2014, between 3:03 p.m. and 3:26 p.m. In that interview, Appellant explained the manner in which he played with his children and his account of the events that took place on August 1, 2014. Specifically, Appellant told detectives that he placed H.A. in the bassinet upstairs, went downstairs to get food, heard a noise upstairs, and ran back to the bedroom. Once there, Appellant observed H.A. unresponsive on the floor of the bedroom. Appellant asked his sister for help, and while she called 911, he attempted to perform CPR on H.A. Rather than wait for an ambulance, Appellant

picked up H.A., ran outside, and flagged down a motorist, who drove to and dropped them off at Einstein Emergency Department.

Detectives responded to this account by asking Appellant how he played with H.A. Appellant responded as follows.

> Uh, sometimes I throw, I throw my son in the air … But I still support his head … Okay, and sometimes I hold him like real close to me and I spin him around real hard like. So he gets dizzy … And then lay him on the bed, I just like seeing him dizzy like that … Oh the pats on the back … they're pretty heavy[-]handed. And I pat him on the back.

Commonwealth's Trial Exhibit 48A, at 4. When asked how H.A. sustained bone fractures, Appellant said, "[s]ometimes we play too rough." *Id.* When asked whether he played rough with H.A. prior to August 1, 2014, Appellant replied, "early last week, probably Monday, Tuesday, Wednesday" he held H.A. "real tight, lots of poppa bear hugs." *Id.* at 5. Appellant acknowledged that the way he played with H.A. could have caused his injuries and that his wife, mother, and father confronted him about how he played with H.A. and stopped him when he played too rough. Finally, Appellant apologized for his behavior, which he claims was not intentional, but a mistake.

> So, I apologize to my wife and to [H.A.], and to my family. It is my fault that [H.A.] is in critical condition for me handling him too rough, and he's very fragile. I mistake him, sometimes, for being my 1[-]year[-]old, sometimes even when I change [H.A.'s] diaper, I change him a little rough.

*Id.* at 8. Based on the foregoing, Appellant was charged with third-degree murder and EWOC.

Prior to trial, Appellant filed a motion seeking to suppress the statements he made while in custody at the Philadelphia Police Department homicide unit, including the video statement. Appellant averred that his statements were rendered involuntary due to the duration of the interrogation, psychological coercion, and improper *Miranda*[2] warnings he was given over the course of the interrogation. N.T., 6/15/2016, at 211-19. After a pre-trial hearing, the suppression court granted the motion in part and denied the motion in part.[3]

The case proceeded to a jury trial, where the aforementioned facts were developed and Appellant's video statement was introduced. Appellant was convicted of the aforementioned crimes. On September 23, 2016, Appellant was sentenced to a term of imprisonment of 15 to 30 years, followed by 7 years of probation. Appellant timely filed a post-sentence motion for a new trial, in which he challenged the denial of the motion to suppress his video statement and the weight of the evidence to sustain his

_____

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] The suppression court suppressed Appellant's statements made between August 1, 2014, at 11:58 p.m., and August 2, 2014, at 11:47 a.m., finding that Appellant was not properly given *Miranda* warnings. In contrast, the suppression court found Appellant's video statement, which was made on August 2, 2014, between 3:03 and 3:26 p.m., followed proper *Miranda* warnings, and was a knowing, intelligent, and voluntary statement. N.T., 6/15/2016, at 242-44. On appeal, Appellant challenges the trial court's order denying the motion to suppress the video statement. Appellant's Brief at 8.

convictions. On November 18, 2016, the trial court denied Appellant's post-sentence motion. Subsequently, Appellant's counsel failed to file timely a notice of appeal to this Court.

Appellant filed a petition on January 26, 2018, pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, seeking the reinstatement of his right to file a direct appeal *nunc pro tunc*.[4] The PCRA court ultimately granted Appellant's petition, and this timely-filed appeal followed.[5]

On appeal, Appellant challenges the orders denying his suppression and weight of the evidence claims. Appellant's Brief at 8.

We first address Appellant's challenge to the order denying his motion to suppress. Appellant argues his statement was not voluntary, as it was the product of coercion. *Id.* at 32-33, 39, 48-50. Specifically, Appellant avers: 1) the duration of the interrogation was excessive; 2) his physical and psychological state were both poor because "he was given crackers and two

---

[4] Appellant's *pro se* PCRA petition was facially untimely. However, because Appellant pleaded and proved an exception to the PCRA's time-bar, **see** Amended PCRA Petition, 7/19/2018, at 14-17, the PCRA court had jurisdiction to reinstate Appellant's right to file a direct appeal. **See** 42 Pa.C.S. § 9545(b)(1).

[5] Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

minutes to eat a sandwich over [a] 20 hour period,"[6] he was left in a room unsuitable for sleep, and his requests to speak to his wife and see H.A. were rejected; and 3) the detectives' attitudes were "both manipulative and coercive" as they "attacked his masculinity" and told Appellant "his own parents did not believe" he was innocent. *Id.* at 49. Appellant contends these circumstances should be considered mindful of Appellant's absence of previous arrests, as well as the earlier improper *Miranda* warnings given by the detectives. *Id.* at 50.

We review this issue mindful of the following.

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.
>
> ***
>
> It is well-established that when a defendant alleges that his confession was involuntary, the inquiry becomes not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it

---

[6] Although Appellant was physically at the homicide unit for over 20 hours, he was in legal custody for approximately 16 hours. N.T., 6/15/2016, at 237-42.

deprived the defendant of his ability to make a free and unconstrained decision to confess. The voluntariness of a confession is determined from a review of the totality of the circumstances surrounding the confession. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516-25 (Pa. 2017) (internal citations omitted).

Providing additional guidance, our Supreme Court has set forth the following principles to review challenges to the voluntariness of a confession.

The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. **The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression of the statement.** Numerous factors should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the means and duration of the interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Martin*, 101 A.3d 706, 724-25 (Pa. 2014) (internal citations omitted) (emphasis added).

- 8 -

In its Pa.R.A.P. 1925(a) opinion, the trial court offered the following analysis in support of its order denying Appellant's motion to suppress.

> This [c]ourt observed the videotape of [Appellant] in the interview room and considered all the circumstances leading to the final statement. This [c]ourt does not find the length of time between the initial detention and the [video] statement unduly coercive. The detectives were actively investigating during that time frame. The length of time between [Appellant's] arrest and confession does not render a confession involuntary absent evidence of an effort to coerce a confession or overcome [Appellant's] will. **See Commonwealth v. Sepulveda**, 855 A.2d 783, 793 (Pa. 2004).
>
> Furthermore, this [c]ourt finds that the conditions in the interview room were not unduly coercive. [Appellant] had the opportunity to be left alone and slept during the overnight hours. He was fed and permitted to use the restroom. [Appellant] was not in emotional or physical distress and was eating, drinking coffee[,] and engaging in conversation with the detectives. He did not exhibit behavior indicative of mental illness. He was not intoxicated. [Appellant] was a high school graduate and was currently studying to receive his CDL. Although there were some coercive tactics[,] *i.e.*[,] Detective White telling [Appellant] to be a man and that his parents didn't even believe him[], the court did not find that these tactics were so reprehensible to basic societal notions of fairness to vitiate the voluntariness of the statement. The Pennsylvania Supreme Court has found that the use of artifice or even intentional misrepresentations to obtain a confession is insufficient to make an otherwise voluntary confession inadmissible "where the deception does not produce an untrustworthy confession or offend basic notions of fairness." **See Commonwealth v. Williams**, 640 A.2d 1251, 1259 (Pa. 1994) (claim that police falsely stated that they had located a gun sold by the defendant which was of the same caliber used in the crime, was not sufficient to render a confession involuntary absent other coercive circumstances); **see also Commonwealth v. Jones**, 322 A.2d 119 (Pa. 1974) (finding confession was voluntary even though, after the defendant gave an initial exculpatory statement, the detective falsely claimed that a co[-]conspirator had implicated him).

This [c]ourt found that the [video] statement taken from 3:03 p.m. until 3:26 p.m. on August 2, 2014, was knowing, intelligent and voluntary.

Trial Court Opinion, 4/1/2019, at 4-6 (citations omitted).

Our review of the record confirms the trial court's cogent analysis and we find it aligned with our well-settled case law. Although Appellant was previously given improper ***Miranda*** warnings, indeed, the police properly advised Appellant of his constitutional rights prior to obtaining the video statement taken from 3:03 p.m. until 3:26 p.m. on August 2, 2014. A prior ***Miranda*** violation does not preclude a suspect from waiving ***Miranda*** rights in the future, after receiving the requisite warnings. ***See Oregon v. Elstad***, 470 U.S. 298 (1985). Thus, we agree with the trial court that based upon the totality of the circumstances, Appellant's video statement was given knowingly, intelligently, and voluntarily and therefore did not warrant suppression. ***See Commonwealth v. Harrell***, 65 A.3d 420, 435 (Pa. Super. 2013) (holding the trial court did not err in denying a motion to suppress where "[t]he totality of the circumstances indicate[d] that [Harrell] knowingly and voluntarily chose to waive his ***Miranda*** rights and make a statement").

In Appellant's second issue raised on appeal, he claims the trial court abused its discretion by not granting him a new trial on the basis that the verdict as to both of his convictions was against the weight of the evidence. Appellant's Brief at 33, 51-64. Specifically, to support his contention,

- 10 -

Appellant argues that "[n]o one witnessed the child's fatal injuries," asserts the child's injuries were "accidental in nature," and cites trial testimony that he is a peaceful and law-abiding citizen. *Id.* at 63. In addition, Appellant claims that "[t]he jury placed greater weight upon the expert witness's conclusion – based upon a preponderance of the evidence standard." *Id.* at 64.

We consider this claim mindful of the following.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim **is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence**. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2005) (internal citations omitted) (emphasis in original)).

After reviewing all of the evidence, "including evidence of the [Appellant's] good character[,]" the trial court concluded the verdict was not against the weight of the evidence because the decedent endured injuries

- 11 -

indicative of a severe assault while under Appellant's exclusive care. Trial Court Opinion, 4/1/2019, at 16. The trial court's conclusion is supported by the record.

At trial, the Commonwealth presented the testimony of Dr. McColgan, medical director of the child protection program at Saint Christopher's, as well as forensic pathologist Dr. Wainer, who had reviewed the autopsy report prepared by his colleagues. Dr. McColgan, facing a litany of hypotheticals, made clear that H.A.'s injuries were sustained due to a significant, severe impact and could neither have been sustained falling out of his bassinet nor inflicted by a one-year-old baby. N.T., 6/17/2016, at 80-81, 104-109. Dr. Wainer summarized the multitude of injuries that were documented over H.A.'s entire body. Dr. Wainer opined that the injuries were caused by multiple impacts and similarly ruled out the possibility that the injuries could have been caused by a fall or inflicted by a one-year-old baby. N.T., 6/20/2016, at 28, 44-45, 64. Finally, Dr. McColgan and Dr. Wainer concluded in their diagnoses, respectively, that H.A.'s injuries were "inflicted" or the result of "physical abuse," and the "cause of death in this case [was] blunt impact trauma to the head and the manner of death [was] homicide." N.T., 6/17/2016, at 65; N.T., 6/20/2016, at 18.

Regarding Appellant's claim that the jury improperly weighed the expert witness's conclusion using a preponderance of the evidence standard, the trial court aptly explained the error in this claim, as follows.

- 12 -

> [Appellant] claims that Dr. Wainer's testimony, that the term, "reasonable degree of medical certainty", means "more likely than not", was not sufficient to establish the cause and manner of death beyond a reasonable doubt. [Appellant] is confusing a legal term of art: "reasonable degree of medical certainty[,]" which is used to describe an expert opinion as one that would be widely accepted in the medical community, with a legal standard, proof beyond a reasonable doubt.

Trial Court Opinion, 4/1/2019, at 14.

As to Appellant's argument that his son's injuries were accidental and testimony showed that he is peaceful, we note that it is within the province of the jury, sitting as fact-finder, to review the evidence and assess the credibility of the testifying witnesses. *See Commonwealth v. Williams*, 854 A.2d 440, 445 (Pa. 2004). "[E]vidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Hughes*, 908 A.2d 924, 928 (Pa. Super. 2006). Issues of credibility are left to the jury; "the jury is free to accept all, part, or none of the witness testimony." *Commonwealth v. Russell*, 665 A.2d 1239, 1246-47 (Pa. Super. 1995) (citations omitted). The jury was free to believe the testimony of Dr. McColgan and Dr. Wainer. Moreover, Appellant's own recitation of the episode and the manner in which he played with H.A., in context, allow one to infer that the child's fatality was caused by Appellant. N.T., 6/20/2016, at 139-58, 165-71.

Upon review, we discern no abuse of discretion in the trial court's conclusion that the verdicts were not against the weight of the evidence. Thus, Appellant's challenge to the weight of the evidence fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/3/20